1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ASTRAILIA I. DUNFORD, individually and
on behalf of all similarly situated,

        Plaintiff,

 v.

AMERICAN DATABANK, LLC,

        Defendant.

_____/

No. C 13-03829 WHA

**ORDER RE MOTION FOR
SUMMARY JUDGMENT AND ORDER
DENYING CLASS CERTIFICATION**

**INTRODUCTION**

In this putative class action involving the Fair Credit Reporting Act, plaintiff moves to certify two classes under Rule 23(b)(3) seeking statutory penalties for willful violations. Defendant moves for summary judgment. For the reasons stated herein, no classes are certified. Summary judgment is denied.

**STATEMENT**

The essence of the case is that our named plaintiff Astrailia Dunford applied for a nursing program at a local community college. The program required an unpaid clinical internship in order to earn a degree. Ms. Dunford ordered and paid for a background report, as required by the school, prepared by defendant American DataBank, LLC. She received and read the report and forwarded it to the community college to share with hospitals participating in the clinical internships. Although American DataBank never directly sent the report to the college or the clinics, it knew its report would be used for evaluating admission to clinical internships. American DataBank's report accurately disclosed her criminal history, including seven convictions (one felony) and, apropos of this lawsuit, several dismissals of related charges. She was terminated from enrollment as a result. Her criminal troubles, however, continue to this day.

United States District Court

For the Northern District of California

1   Indeed, the day before the class certification hearing, she was arrested and pled guilty to

2   aggravated trespass of an occupied dwelling.  Now follow the details.

3                        *              *              *

4        In 2012, Ms. Dunford applied for a nursing program at San Diego City College.  Ms.

5   Dunford was accepted to begin in the fall of 2013 (Dunford Dep. 39, 52).

6        At San Diego City College, immediately upon acceptance to the nursing program, students

7   were instructed to request a background check and to do so from American DataBank.  This was

8   because nursing students at San Diego City College were required to complete an unpaid clinical

9   program.  All clinical facilities required a background check, including drug testing and criminal

10  history, before training commenced (Berg. Decl. ¶¶ 2, 5, 6).  San Diego City College had an

11  arrangement with American DataBank to prepare all such background checks to be sent directly

12  to the student (not the school).  The procedure was that the student, not San Diego City College,

13  requested and paid for the report online, and the student forwarded it to the school which

14  forwarded it to the clinics, a procedure known to American DataBank.

15       Ms. Dunford followed this procedure.  Upon acceptance to San Diego City College, Ms.

16  Dunford went to the American DataBank website, paid the fee, and ordered a report.  She

17  electronically signed American DataBank's "Disclosure & Release Form."  The form was

18  provided on an American DataBank website set up for San Diego City College.  Nursing students

19  at San Diego City College had to complete the "Disclosure & Release Form" to get a report.  The

20  form stated (Marchiando Exh. 1) (original emphasis omitted):

21           As part of the application process for participation and/or
             acceptance at San Diego Nursing Service Education Consortium,
22           I understanding that they and/or its agents may conduct an
             investigation of my personal information.  The Investigation may
23           include, but is not limited to Criminal History Records (from State,
             Federal and Other Agencies) . . . National Criminal Index
24           Search . . . Motor Vehicle Records, Drug Screen Results . . . and
             other information from other sources.  I understand that these
25           records may be used for the eligibility of my acceptance into the
             aforementioned institution's educational program.  I authorized
26           without reservation the full release of these records and for
             American DataBank and/or its agents contracted by American
27           DataBank to obtain information.

28

                                      2

Significantly, the American DataBank form also included the following release:

> In addition, I release and discharge American DataBank, and all of its agents and associates, any expenses, losses, damages, liabilities, or any other charges or complaints for the investigative process.

Ms. Dunford signed the form and her report was completed on June 13, 2013 (Bradley Decl. ¶ 11; Bradley Dep. 76–78).

American DataBank sent the report to Ms. Dunford. American DataBank never provided Ms. Dunford's consumer report to San Diego City College or any hospital or clinic (Bradley Decl. ¶¶ 2–4). Again, however, American DataBank (via its arrangement with San Diego City College) knew the report would be shared with the school and clinics. The corner of the report stated "Requested by: San Diego NSEC - San Diego City College" (Livingston Exh. 4). American DataBank's internal codes allowed consumers to specify the school when the request was made (Bradley Dep. 42–44).

When Ms. Dunford received the report via email, she reviewed it (Dunford Dep. 46–49):

> Q. And when you received the background report, you reviewed it, I assume. Correct?
>
> A. Yes.
>
>       *                   *                   *
>
> Q. After you actually received your background report, did you make another call to American DataBank to discuss it?
>
> A. No. I didn't know that I should.

Ms. Dunford then forwarded the report to the school. Deborah Berg, Associate Dean and Director of Nursing Education at San Diego City College, wrote Ms. Dunford the following email, dated June 28, 2013 (Livingston Exh. 5) (emphasis added):

> Thank you for sending the results of you [sic] background check. It just so happened that the person responsible for making these decisions at Kaiser was attending a class in our department so I printed the results and took it to her to ask her if she would allow you to do clinical [sic] at any Kaiser facility. *Her answer was NO, I am sorry to say. I did send your results to other facility representatives but I suspect the answer will be the same.* At this point, I think you should withdraw your application from our nursing program (you may get it from Susan if you want it) and pursue another career. I'm Sorry [sic], again, and I wish you luck.

United States District Court
For the Northern District of California

Ms. Berg had sent the report to all of the relevant clinical sites.  Each of the relevant clinical sites replied that they would not accept Ms. Dunford (Berg Decl. ¶¶ 8–9).  Because completion of an unpaid clinical program was required for graduation, if a student was denied access to all available clinical facilities, the student could not continue in the nursing program.  Ms. Berg later wrote: "I think it is the violence.  According to Kaiser, they don't take anyone with a violent crime" (Livingston Exh. 5; Dunford Dep. 50; Berg Decl. ¶¶ 4, 10).

Ms. Dunford's report accurately revealed seven convictions on six occasions (Livingston Exh. 4).  This order will first lay out the challenged entries on Ms. Dunford's report.  To be clear, Ms. Dunford does not challenge the *accuracy* of any entry; her grievance is that in addition to disclosing her seven convictions (unchallenged), American DataBank included, for matters showing a conviction, dismissed charges (challenged) in the same court file as the conviction.

The challenged entries are as follows.  In January 2005, Ms. Dunford was charged with two misdemeanors arising from the same transaction — driving under the influence.  She was convicted of the second charge but the first charge was dismissed the same day (Dunford Decl. ¶ 3).  Her report stated (Livingston Exh. 4) (the challenged item is in italics):

> CASE #:  M950249
>
> VIOLATION DATE:  12/25/2004
>
> FILE DATE:  01/11/2005
>
> DISPOSITION DATE:  03/07/2006
>
> CHARGE:  *C1=VC23152(A) DUI*, C2=VC23152(B) DUI WITH BAC OF .08% OR MORE
>
> CASE TYPE:  MISDEMEANOR
>
> DISPOSITION:  *C1=DISMISSED* C2=CONVICTED

Ms. Dunford contends that the first dismissed charge (italicized above) antedated the report (dated June 13, 2013) by more than seven years.  The report should not have contained the dismissed charge, she argues, even though it was part of a court file that included a reportable conviction.

In November 2005, Ms. Dunford was charged with three misdemeanors.  She was convicted of public intoxication but the other two charges were dismissed the same day

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   (Dunford Decl. ¶ 6).  The report stated (Livingston Exh. 4) (emphasis added to show the

2   challenged information):

3       CASE #:  M975240

4       VIOLATION DATE:  08/22/2005

5       FILE DATE:  11/02/2005

6       DISPOSITION DATE:   03/07/2006

7       CHARGE:  *C1=HS11550(A)-USE/UNDER THE INFLUENCE OF*
        *CONTROLLED SUBSTANCE,*
8       *C2=PC148(A)(1)-OBSTRUCTING/RESISTING OF OFFICER*,
        C3=PC647(F)-DISORDERLY CONDUCT:  PUBLIC
9       INTOXICATION

10      CASE TYPE:  MISDEMEANOR

11      DISPOSITION:  *C1, 2=DISMISSED* C3=CONVICTED

12  She contends that the two dismissed charges should not have appeared on her report because they

13  antedated the report by more than seven years.  (Her complaint previously alleged that her report

14  should not have disclosed convictions which were subsequently expunged, but plaintiff's counsel

15  have now represented that plaintiff does not contend that those entries violate Section

16  1681c(a)(5).)

17     For the record, Ms. Dunford's criminal history and report included the following further

18  entries (not challenged herein).

19      CASE #:  SCD211527

20      VIOLATION DATE:  01/28/2008

21      FILE DATE:   01/31/2008

22      DISPOSITION DATE:   03/12/2008

23      CHARGE:  C1=PC422- CRIMINAL THREATS, C2=PC69 -
        DETER/OBSTRUCT OFFICER FROM PERFORMING DUTIES,
24      C3=PC273.6(A) - VIOLATE PROTECTIVE ORDER (MISD),
        C4=PC594(A)(B)(2)(A)-VANDALISM
25
        CASE TYPE:  FELONY
26
        DISPOSITION:  C1, 4=DISMISSED C2, 3=CONVICTED
27
        SENTENCE:   3 YEARS FORMAL PROBATION, 1 YEAR JAIL
28      WITH 190 DAYS CREDIT, $680.00, NO FIREARMS ADVISAL

**United States District Court**
For the Northern District of California

\*          \*          \*

CASE #:  M994285

VIOLATION DATE:  07/05/2006

FILE DATE:  07/07/2006

DISPOSITION DATE:   07/07/2006

CHARGE:  C1=PC148(A)(1)- OBSTRUCTING/RESISTING OF OFFICER

CASE TYPE:  MISDEMEANOR

DISPOSITION:  CONVICTED

\*          \*          \*

CASE #:  M013272

VIOLATION DATE:  03/14/2007

FILE DATE:   03/16/2007

DISPOSITION DATE:   03/16/2007

CHARGE:  C1=PC148(A)(1)- OBSTRUCTING/RESISTING OF OFFICER, C2=PC415(1)-DISTURBING THE PEACE

CASE TYPE:  MISDEMEANOR

DISPOSITION:  C1=DISMISSED C2=CONVICTED

\*          \*          \*

CASE #:  M138950

VIOLATION DATE:  10/19/2011

FILE DATE:   10/19/2011

DISPOSITION DATE:  10/27/2011

CHARGE:  C1=PC243(B)- BATTERY ON PEACE OFFICER, C2, 3=PC240-241(C)-ASSAULT ON OFFICER

CASE TYPE:  MISDEMEANOR

DISPOSITION:  C1, 3=DISMISSED C2=CONVICTED

In response to orders to disclose more about her criminal history, Ms. Dunford further revealed that she was further charged with "felony possession of a controlled substance with a firearm enhancement" in July 2005.  The charge was dismissed and did not appear on her report.

6

United States District Court

For the Northern District of California

In September 2010, Ms. Dunford pled no contest to misdemeanor "intoxicated pedestrian" and misdemeanor unlawful dumping of garbage in Lake Tahoe.  The 2010 conviction did not appear on her report.  In June 2014, while this action was underway, Ms. Dunford was charged with felony first-degree burglary and misdemeanor vandalism.  She was convicted of the misdemeanor vandalism charge but the felony burglary charge was dismissed.  She stated that she "entered the wrong apartment . . . while intoxicated."  She also "willfully [and] maliciously damaged or defaced the personal property of another" (Dunford Exh. 2).  In July 2014 (again, while this action was underway), she was arrested and charged with two counts of vandalism and one count of "aggravated trespass of occupied dwelling house."  She pled guilty to the aggravated trespass charge and the vandalism charges were dismissed (Dkt. No. 96-1, Dunford Decl. ¶¶ 3, 6, 9, 10; Dkt. No. 58-12, Dunford Decl. ¶¶ 10, 22).  The June 2014 and July 2014 convictions were separate actions.  So, in addition to the seven convictions shown in the report at issue, she has sustained four more.  During her deposition, she stated that she previously resided in an alcohol-treatment facility pursuant to a court mandate (Dunford Dep. 16–17).  All this bears on her suitability to carry out the fiduciary post she seeks under Rule 23, discussed below.

The nursing program at San Diego City College was part of a consortium.  Specifically, the San Diego Nursing Service-Education Consortium is comprised of five nursing schools and a number of clinical facilities in the San Diego area.  During the relevant time period, American DataBank and the San Diego Nursing Service-Education Consortium ("Subscriber") held a "Service Agreement for Customized Screening Services."  The agreement stated (Dkt. No. 58-7) (emphasis added):

> American DataBank agrees to furnish to Subscriber . . . civil and criminal records . . . and other background information ("consumer report") on *applicants/employees*, as requested by the Subscriber.

> *          *          *

> Unless requested by the client or government regulation[,] we will provide the criminal records for a minimum of seven years.  Unless otherwise requested by clients, American DataBank will only provide convicted criminal records and we do not include arrest records as part of criminal records.

> *          *          *

**United States District Court**
For the Northern District of California

Subscriber *certifies* that it is requesting American DataBank to provide screening services only for the purposes of considering an individual for enrollment, *internship*, employment, promotion, reassignment or retention as a *student or employee*, and for no other purposes.

\*　　　　　\*　　　　　\*

Subscriber certifies that prior to requesting American DataBank to provide screening services for *enrollment/employment purposes* on an *applicant/employee*, it has provided the applicant/employee with a clear and conspicuous written disclosure, in a document consisting solely of the disclosure, that a consumer report is being requested for *enrollment/employment purposes*, and it has obtained the written authorization from the *applicant/employee* to obtain a consumer report for enrollment/employment purposes. A standard disclosure and authorization form is available from American DataBank for these purposes.

\*　　　　　\*　　　　　\*

All students/faculty requesting a background check must sign and send a disclosure release form to American DataBank. The customized Disclosure and Release form is available through our website.

Again, San Diego City College required that its students use American DataBank to request reports (Berg Decl. ¶ 10). American DataBank maintained a website for students to request a report, pay a fee, and sign a "Disclosure & Release Form." American DataBank made the "Disclosure & Release Form" available to its subscribers (including San Diego City College), but the subscribers were not required to use American DataBank's form. San Diego City College chose to require American DataBank's form, which Ms. Dunford signed (Bradley Dep. 75, 85).

Even though the consortium services agreement referred to "applicant/employee," "enrollment/employment purposes" and "student or employee," Mr. Bradley, Vice President of American DataBank, testified that defendant did not run background checks for the consortium employees or applicants for employment to the consortium. It only ran background checks for nursing students and instructors who needed access to the clinical facilities (Bradley Dep. 11, 63, 89).

\*　　　　　\*　　　　　\*

This order will now describe American DataBank's reporting procedures. Mr. Bradley, Vice President of American DataBank, stated (Bradley Decl. ¶¶ 15, 16):

8

> American DataBank's procedures are set up to easily distinguish between "employees" and "non-employees" because American DataBank follows the industry-wide practice that when a search is done for purposes of employment, it is always initiated, ordered and paid for by the employer. By contrast, a search done for a student will always and necessarily be initiated, ordered and paid for by the student on the website that American DataBank creates for each school . . . . American DataBank has always believed that students who use the school website created by American DataBank to order and pay for their own background search report, did so for purposes of getting into an education program and not forpurposes [sic] of getting a job.

He testified (Bradley Dep. 67–68):

> Q. Is there a difference in how American DataBank procures or processes a report for the Consortium versus one that it procures for employment purposes?
>
> A. There is.
>
> Q. What's the difference?
>
> A. The difference is that the consumer is not the one that requests the report. If the request is for employment purposes, the consumer does not pay for that background report. The request comes from the employer directly, and they must be issued a user ID and password to log into our system to request a report directly.
>
> Q. Whereas the consumer – for example, in Ms. Dunford's case, when she ordered it, she went through the Consortium website that American DataBank creates; right?
>
> A. Yes. She requested and paid for her own report.

To assemble its reports, American DataBank conducted criminal record searches through court records. Rather than automate the review process, American DataBank had humans review the reports. It used a "three-layered process." Mr. Bradley testified (Bradley Dep. 95, 103–104):

> It begins by first an external process in which we instruct our vendors on what information it is that we want to report. Second step is internal, in which our team members are receiving continuous, ongoing training to review the accuracy of the information that's been reported by vendors and that they find internally. And the third-step process is a final review that's conducted by quality assurance.

Courtney Cox, the head of American DataBank's quality-assurance program, testified (Cox Dep. 45–46) (emphasis added):

**United States District Court**
For the Northern District of California

> Q.  Tell me about the quality assurance process, please.
>
> A.  Our researchers are trained in the initial process.  Then it's escalated to order review, where it's reviewed.  *Then there is a third step, profile review, in some cases, where it's additionally reviewed.*

The reviewers checked the reports based on American DataBank's checklist and operating manual (Cox Dep. 47–48, 68–69).

The procedures varied by jurisdiction.  California clients, for example, received an additional "profile review."  Ms. Cox testified (Cox Dep. 46–47, 73):

> Q.  Do you know what it is specifically about California that triggers American DataBank to say that reports on individuals from California require profile review?
>
> A.  We ensure that all criminal convictions are within a seven-year time line.
>
> Q.   But you don't do that generally for other states?
>
> A.  Generally, no.
>
> \*               \*               \*
>
> Q.  Do you recall whether the checklist addresses the need to identify information that predates the report by more than seven years?
>
> A.  The check list does address the fact that California requires a seven-year time line.
>
> Q.  But no other state?
>
> A.  No.

In other words, American DataBank's review procedures varied by state and California clients were subject to different review criteria.

Ms. Dunford was a California client.  According to the record, her report was an aberration from American DataBank's California procedure because it contained dismissed charges antedating the report by more than seven years.  Mr. Bradley, Vice President of American DataBank, testified (Bradley Dep. 94–95, 103–104):

> Q.  You're aware of Ms. Dunford's allegations that there are dismissed charges that are reported on this report; is that accurate?
>
> A.  Yes.

10

1                              *              *              *

2          Q.  Does it bother you?

3          A.  Yes.

4          Q.  Why does it bother you?

5          A.  We have processes in place to prevent these things from
           happening, and it slipped through.

6                              *              *              *

7          Q.  And so the result of Ms. Dunford's report where there's
8          dismissed charges older than seven years that are reported, that was
           just somebody just missed it?

9          A.  It's an erroneous error, yes.

10    He admitted that Ms. Dunford's report "did not conform to California law;" but there are no

11    California law claims in this action (Bradley Decl. ¶ 11).  "Currently, Plaintiff is aware of only

12    Ms. Dunford's report as containing obsolete information" (*e.g.*, dismissed charges antedating the

13    report by more than seven years) (Marchiando Decl. ¶ 3, dated July 2014).

14                              *              *              *

15          In June 2013, plaintiff commenced the instant action involving the Fair Credit Reporting

16    Act ("FCRA"), 15 U.S.C. 1681, *et seq*., in Alameda County Superior Court.  *Jane Roe v.*

17    *American Databank, LLC*, No. HG13682746.  Removal occurred in August 2013.  In December

18    2013, Ms. Dunford intervened as a plaintiff and Jane Roe was dismissed (Dkt. Nos. 26, 27).

19    Again, Ms. Dunford's report was sent to her in June 2013 and she intervened in December 2013.

20    Plaintiff admits that the two-year statute of limitations applies to her claims.  *See* 15 U.S.C.

21    1681p.  (Other putative class members, however, may be subject to a five-year statute of

22    limitations.)

23          Plaintiff's three claims for relief are:  (i) "procuring consumer reports without first making

24    proper disclosures" under Section 1681b(b)(2)(A)(i); (ii) "furnishing consumer reports without

25    first obtaining proper certification" under Section 1681b(b)(1); and (iii) "disclosure of obsolete

26    and adverse information that antedates the report by more than seven years" under Sections

27    1681c(a)(2) and (5).  Plaintiff seeks to represent two classes seeking willful penalties only for the

28    alleged willful violations.  American DataBank now moves for summary judgment on all three

1   claims for relief.  Ms. Dunford opposes and moves to certify two classes, appoint herself as the

2   class representative, and appoint the law firm of Caddell & Chapman, located in Houston, Texas,

3   as class counsel (or interim counsel).  Ms. Dunford proposes the following nationwide

4   "Disclosure Form" class:

> All individuals who ordered a consumer report on said individuals
> from American DataBank wherein the request was made by
> executing a Disclosure and Release Form containing the statement
> "I release and discharge American DataBank, and all of its agents
> and associates, any expenses, losses, damages, liabilities, and any
> other charges or complaints for the investigative process" during
> the [FCRA] statute of limitations period preceding the filing of this
> Lawsuit and continuing through the date the Class list is prepared.

She also proposes the following nationwide "Obsolete Information" class:

> All natural persons residing in the United States (including all
> territories and other political subdivisions of the United States)
> (a) who were the subject of the American DataBank consumer
> report; (b) that contained at least one record of (i) cases under Title
> 11 of the Bankruptcy Act that, from the date of entry of the order
> for relief or the date of adjudication, whichever is applicable,
> predates the report by more than ten years, (ii) civil suits, civil
> judgments, and records of arrest that, from the date of entry, predate
> the report by more than seven years or until the governing statute of
> limitations has expired, whichever period is longer, (iii) paid tax
> liens which, from the date of payment, predate the report by more
> than seven years, (iv) accounts placed for collection or charged for
> profit and loss which predate the report by more than seven years,
> or (v) any type of criminal history information (other than criminal
> conviction) that predates the report by more than seven years; (c)
> that was furnished for an employment purpose for a position for
> which the annual salary is less than $75,000; and (d) within the
> FCRA statute of limitations period preceding the filing of this
> action through the date the Class list is prepared.

Ms. Dunford — a convicted felon with a lengthy and current criminal history — seeks to

represent both proposed classes, asserting that American DataBank willfully violated the FCRA.

This order follows full briefing, supplemental submissions, and oral argument.

## ANALYSIS

**1.    MOTION FOR SUMMARY JUDGMENT.**

**A.    Procurement.**

Before addressing Ms. Dunford's individual case, it is important to consider the following

more typical example of how the Act contemplates background checks are obtained for

employment purposes:  A prospective employee applies for a job with a prospective employer.

12

United States District Court

For the Northern District of California

The prospective employer provides the applicant with a disclosure and authorization form.  The form states that a consumer report will be obtained for employment purposes.  The form provides a space for the applicant to authorize the prospective employer to obtain a consumer report.  The prospective employer certifies to the consumer reporting agency that it has obtained a disclosure and authorization form from the applicant and that the information from the consumer report will not be used in violation of any applicable federal or state equal employment opportunity law or regulation.  The consumer reporting agency sends the consumer report only to the prospective employer.  The applicant does not receive a copy of the report (unless there is to be an adverse action, 15 U.S.C. 1681b(b)(3)).

Our case differs from the usual scenario.  *First*, in our case, the nursing student requested, paid for, and obtained the report directly from the credit reporting agency.  American DataBank never sent the report to San Diego City College or the clinics.  *Second*, the student was required by the school to use American DataBank to obtain her report; in turn, American DataBank (not the school or the clinics) maintained and provided the "Disclosure & Release Form."  The form included a release from American DataBank.  *Third*, the consortium used a services agreement to certify, *inter alia*, that American DataBank's services would be "for the purposes of considering an individual for enrollment, internship, employment, promotion, reassignment or retention as a student or employee."  The agreement repeatedly referred to "applicant/employee" and "enrollment/employment purposes."  American DataBank knew the report would be used by the clinics to evaluate eligibility for clinical internships.  *Fourth*, the subject of the consumer report was a nursing student seeking an unpaid clinical internship required for graduation.

Two of Ms. Dunford's claims for relief are brought under subsections of Section 1681b(b), titled "[c]onditions for furnishing and using consumer reports for *employment purposes*" (emphasis added).  In other words, the provisions therein apply to reports for "employment purposes."

Section 1681b(b)(2)(A) states (emphasis added):

> Except as provided in subparagraph (B) [application by mail, telephone, computer, or other similar means], a person may not procure a consumer report, or cause a consumer report to be

13

procured, *for employment purposes* with respect to any consumer, unless —

(i) *a clear and conspicuous disclosure* has been made in writing to the consumer at any time *before the report is procured* or caused to be procured, *in a document that consists solely of the disclosure*, that a consumer report may be obtained for employment purposes; and

(ii) the consumer has authorized in writing (which authorization may be made on the document referred to in clause (i)) the procurement of the report by that person.

*If* Ms. Dunford's report had been for "employment purposes" (a disputed issue), it is quite clear (and seems undisputed) that American DataBank's "Disclosure & Release Form" would have violated Section 1681b(b)(2)(A)(i) by containing a release. The document did not consist solely of a disclosure because it added a paragraph exonerating American DataBank. On the other hand, American DataBank reminds us that its form would have been perfectly lawful under the Act if it had been for a non-employment purpose and assures us that reports are regularly requested for such non-employment purposes, such as for educational purposes.

While the undersigned judge was initially of the view that Ms. Dunford's case was compromised by the fact that she (not the school or the clinics) requested the report, the record reveals that American DataBank knew the overall arrangement — that San Diego City College required its students to use American DataBank for their reports, that the students would request them directly from American DataBank and then turn them over to San Diego City College, and that San Diego City College would provide them to the clinics. Indeed, the "Disclosure & Release Form" Ms. Dunford signed and provided American DataBank, identified an affiliation with the "San Diego Nursing Service Education Consortium" and American DataBank's report stated "Requested by:   San Diego NSEC - San Diego City College."

Accordingly, while this order recognizes that we are not dealing with the usual scenario, this order holds that the roundabout arrangement possibly should be collapsed and treated as the usual scenario. Why this proceeding was adopted would be one factor of interest to the Court, if not the jury. Therefore, for now, this order assumes that the roundabout way of obtaining the report was equivalent to a direct request by the school and/or clinics. This issue will be tried.

14

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### B.    "Employment Purposes."

Nevertheless, Section 1681b(b) applies to "consumer reports for *employment purposes*" (emphasis added).  The FCRA defines the term "employment purposes" when used in connection with a consumer report as "a report used for the purpose of evaluating a consumer for employment, promotion, reassignment or retention as an employee."  *See* 15 U.S.C. 1681a(h).

Plaintiff's counsel argue that there is a triable issue for the jury whether nursing students at San Diego City College are "employees" of the clinics, meaning it cannot now be decided as a matter of law whether her report was for "employment purposes."  This order agrees that triable issues remain.

Our court of appeals has no decision on point and the binding citations are not on all fours.  In *Hoke v. Retail Credit Corp.*, 521 F.2d 1079, 1084 (4th Cir. 1975), *cert. denied*, 423 U.S. 1087 (1976), the Fourth Circuit reversed and remanded a grant of summary judgment for defendants.  The Texas Board of Medical Examiners had requested a background report to help assess Dr. Hoke's application for a license to practice medicine in Texas.  The Fourth Circuit found that the information furnished by defendant was a "consumer report" for "employment purposes."  The report was for "employment purposes" because a license was required to practice medicine in Texas and the report was used to assess Dr. Hoke's fitness for a license.  In its footnote seven, the Fourth Circuit further stated that if it was to apply the common-law concept of employee, it would "undoubtedly conclude that a physician who practiced his profession as a sole practitioner or as a member of a medical partnership was an independent contractor, and not an employee."  *Id*. at 1082, n. 7.  Nevertheless, the Fourth Circuit was "not constrained to limit application" of the FCRA — with its broad remedial purposes — to common-law concepts.

After *Hoke*, however, the Supreme Court decided *Nationwide Mutual Insurance Company v. Darden*, 503 U.S. 318, 322–25 (1992) (ERISA), which adopted the common-law test for determining who qualifies as an "employee."  Significantly, the factors include:  the hiring party's right to control the manner and means by which the task is accomplished; the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the

hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party. *Id*. at 323–24. This long list of factors introduces the problem, discussed below, that the answer may well vary from situation to situation and is not amenable to a vast nationwide class proceeding.

In *Lamson v. EMS Energy Marketing Service, Inc.*, 868 F. Supp. 2d 804, 817 (E.D. Wis. 2012), Magistrate Judge William Callahan, Jr. stated that after *Darden*, "*Hoke* is no longer sound law." *Lamson* held that "in assessing whether a person is indeed 'an employee' for purposes of the FCRA, the court is to apply the common-law test that is set forth in *Darden* . . . If such a person does not meet that test, it necessarily follows that he or she is not covered by the FCRA." *Id*. at 818. The district court applied the *Darden* factors and found that plaintiff was an independent contractor. Because plaintiff's report was for evaluating him as an independent contractor (and not as an employee), his claims were dismissed. *Id*. at 816.

Plaintiff relies on the consumer-oriented objectives behind the FCRA. Section 1681 is titled "Congressional findings and statement of purpose." Section 1681(b) states that the FCRA was enacted to "require that consumer reporting agencies adopt reasonable procedures . . . in a manner which is fair and equitable to the consumer . . . ." "Congress enacted FCRA in 1970 to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007). And our court of appeals has stated:

> The FCRA was the product of congressional concern over abuses in the credit reporting industry. The legislative history of the FCRA reveals that it was crafted to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner. These consumer oriented objectives support a liberal construction of the FCRA.

*Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995).

The FTC issued a staff report, dated July 2011, which stated:

> Because the term "employment purposes" is interpreted liberally to effectuate the broad remedial purpose of the FCRA, *it may apply to situations where an entity uses individuals who are not technically employees to perform duties.* Thus, it includes a trucking company that obtains consumer reports on individual drivers who own and operate their own equipment; a title insurance company that obtains consumer reports on individuals with whom it frequently enters into contracts to sell its insurance, examine title, and close real property transactions; *or a nonprofit organization staffed in whole or in part by volunteers.*

FED. TRADE COMM'N., 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT 32, *available at* http://www.ftc.gov/sites/default/files/documents/reports/40-years-experience-fair-credit-reporting-act-ftc-staff-report-summary-interpretations/110720fcrareport.pdf (July 2011) (emphasis added).

American DataBank responds that it did not intentionally or recklessly violate Section 1681b(b) because it believed Ms. Dunford's report was for educational — not employment — purposes. In *Safeco*, the Supreme Court found that while Safeco's specific understanding of the Act (Section 1681m(a), not invoked here) was erroneous, it was not objectively unreasonable. Safeco did not have the benefit of guidance from the courts of appeals or the FTC. There was a "dearth of guidance" and it was a "less-than-pellucid" statute. Safeco's specific actions fell short of raising the unjustifiably high risk of violating the Act necessary for reckless liability. *See Safeco*, 551 U.S. at 69–70.

In some ways, our case differs from *Safeco* because American DataBank entered into a services agreement that repeatedly referred to "applicants/employees," "schools/employers," and "enrollment/employment purposes." The agreement stated that the consortium was (Dkt. No. 58-7) (emphasis added):

> requesting American DataBank to provide screening services only for the purposes of considering an individual for enrollment, *internship*, employment, promotion, reassignment or retention as a *student or employee*, and for no other purpose.

American DataBank also knew the reports would be used by the clinics, a point admitted at oral argument. Notably, the Vice President of American DataBank, David Bradley testified (Bradley Dep. 86–87):

Q. Does American DataBank know what this report is used for?

A. It's used for the students.  They are required to do a clinical course –

\* \* \*

Q. Do they [the clinical facilities] decide it based on the contents of the American DataBank reports?

A. They require a background check and drug screening, and they use a set of criteria before allowing anyone into their sensitive areas of their facility.

\* \* \*

Q. – they base that decision on American DataBank reports?

A. Yes.

The head of American DataBank's quality-assurance program, Courtney Cox testified (Cox Dep. 82):

Q. Ms. Cox, are you aware that individuals applying for nursing school are required to complete a clinical rotation as part of their curriculum?

A. I am aware that that is a requirement for some students.

Q. How are you aware of that?

A. Primarily via speaking with students on the phone.

Q. In what context do you mean speaking with students over the phone?

A. A student may call in to check the status of their background check.  And in the course of that conversation they may tell me that they're having the background check completed so they may complete clinical rotations.

Whether the clinical internships constituted "employment" is a triable issue.  On one hand, the students were unpaid (indeed, they still paid tuition to the school); the students did not receive W-2 forms from the school or clinic; the students were supervised by and reported to a San Diego City College instructor who was present at the facility; the students purchased their own stethoscope and scrubs; and the students were not licensed nurses.  On the other hand, the internships spanned two years (training two prescheduled days a week); the students were covered by the San Diego City College worker's compensation policy and liability insurance; the

18

United States District Court
For the Northern District of California

1   students trained at the clinical facility; the clinics provided the blood pressure cuffs, syringes,

2   gloves, and medical equipment; and by the final semester of the program, the students were

3   performing some or all of the duties of a registered nurse, including taking vitals, providing basic

4   care, and administering medications (Berg Decl. ¶¶ 2–3, 5–6; Berg Dep. 10–13, 17–20, 43,

5   45–46).  (This, of course, is only a partial analysis of the *Darden* factors.)

6       Accordingly, in addition to the roundabout procurement issue, there are triable issues of

7   fact (i) whether the relationship between the nursing students and the clinical facilities constituted

8   "employment," (ii) whether the reports were for "employment purposes," and (iii) whether

9   American DataBank truly believed the reports were for "educational purposes."

10                      *              *              *

11      This order does not hold that American DataBank's reports were for "employment

12  purposes" — a jury, possibly the judge, should decide that question.  Nonetheless, *if* American

13  DataBank's reports were for "employment purposes," this order now goes a step further and holds

14  as a matter of law that the "Disclosure & Release Form" signed by Ms. Dunford violated Section

15  1681b(b)(2)(A)(i) because it did not consist solely of a disclosure, as conceded by defense

16  counsel.

17                      *              *              *

18      Ms. Dunford's next claim for relief is that American DataBank willfully violated Section

19  1681b(b)(1)(A) by failing to obtain certifications from the clinics that obtained her report.  She

20  argues that even though she requested the report, American DataBank knew the clinics would

21  ultimately receive copies of the report and knew that the clinics had not provided certifications of

22  compliance.  This question is complicated by the fact that the students obtained the reports in the

23  first place.  That is, as stated, we are not dealing with the usual employment scenario but are

24  dealing with the roundabout scenario.  This question cannot be decided without the benefit of a

25  more complete record.  Indeed, as the record now stands, there has been no discovery from the

26  clinics.  It is unknown what agreements, if any, the clinics had with American DataBank and/or

27  San Diego City College, how each clinic obtained the reports, how each clinic used the reports,

28  etc.  Summary judgment on the Section 1681b(b)(1)(A) claim is inappropriate.

**United States District Court**
For the Northern District of California

### C.     Dismissed Charges.

The final claim has nothing to do with "employment" but instead rests on a statutory ban on including any criminal information older than seven years, save and except for "records of convictions." Again, the reader should please remember that American DataBank reported counts that were dismissed from the same court files showing a conviction.

Prior to 1998, Section 1681c(a)(5) stated:

> . . . no consumer reporting agency may make any consumer report containing any of the following items of information: . . .
>
> (5) Records of arrest, indictment, or conviction of crime which, from date of disposition, release, or parole, antedate the report by more than seven years.

This blanket ban was amended in 1998 to allow "records of convictions" more than seven years old to be disclosed. The Congressional Record states:

> Under current law, if an individual is seeking a job with an annual salary below $75,000, no records of criminal activity, including convictions, may be reported if they antedate the report by more than seven years. *This information may be of critical value to prospective employers, especially those in the areas of child or elderly care, school bus driving and household services. Under the bill, convictions of crimes from the seven-year obsolescence period would be exempted.*

105 CONG. REC. H10219 (Oct. 8, 1998) (emphasis added). "[T]his bill . . . includes a provision that will allow criminal convictions to be reported past 7 years. This information is critical to employers in the areas of child care, education, and household services." 105 CONG. REC. S11639 (Oct. 6, 1998) (Livingston Exhs. D, E).

Sections 1681c(a)(2) and (5) were thus revised to its current form, which provide (emphasis added):

> . . . no consumer reporting agency may make any consumer report containing any of the following items of information: . . .
>
> (2) Civil suits, civil judgments, and *records of arrest* that, from date of entry, antedate the report by more than seven years or until the governing statute of limitations has expired, whichever is the longer period.

*          *          *

> (5) Any *other adverse item of information*, other than *records of convictions of crimes* which antedates the report by more than seven years.
>
> *          *          *
>
> . . . paragraphs (1) through (5) [*e.g.*, above] . . . are not applicable in the case of . . . the employment of any individual at an annual salary which equals, or which may reasonably be expected to equal $75,000, or more.

In other words, no consumer report (whether for employment purposes or otherwise) may contain "records of arrest" or "adverse item[s] of information" that antedate the report by more than seven years — other than "records of convictions of crimes."  To complicate matters, at least for Rule 23 purposes, these protections do not apply to individuals with employment of an annual salary of $75,000 or more.

Counsel for Ms. Dunford argue that American DataBank willfully violated Sections 1681c(a)(2) and (5) by making a report that contained dismissed charges antedating her report by more than seven years.  *First*, although the report lawfully included the March 2006 conviction for driving under the influence with a blood alcohol content of 0.08% or more (charged in January 2005), it should not have included, she contends, the related dismissed charge of driving under the influence, which was part of the same court proceeding.  *Second*, although the report lawfully included the March 2006 public intoxication conviction (charged in November 2005), it should not have included, she contends, the related dismissed charges of under the influence of a controlled substance and resisting an officer.  In her view, these dismissed charges were "records of arrest" and/or "adverse item[s] of information" that should not have appeared on her report.

The parties primarily rely on four authorities: (i) the FTC's *Advisory Opinion to Nadell* (FED. TRADE COMM'N. Dec. 10, 1998); (ii) *Serrano v. Sterling Testing Systems, Inc.*, 557 F. Supp. 2d 688, 693–94 (E.D. Pa. 2008) (Judge Gene E. K. Pratter); (iii) *Moran v. Screening Pros, LLC*, No. 2:12-CV-05808-SVW, 2012 WL 10655745, at *5 (C.D. Cal. Nov. 20, 2012) (Judge Stephen Wilson); and (iv) *Haley v. TalentWise, Inc.*, No. C13-1915 MJP, 2014 WL 1304007, at *2 (W.D. Wash. Apr. 2, 2014), *reconsideration denied*, 2014 WL 1648480 (W.D. Wash. Apr. 23, 2014) (Judge Marsha Pechman).  This order will address these authorities in chronological order.

American DataBank places undue reliance on the word "about" in the FTC's *Advisory Opinion to Nadell* (FED. TRADE COMM'N. Dec. 10, 1998).  To be clear, the advisory opinion does not state that dismissed charges may appear on a consumer report.  Rather, it states (Livingston Exh. D at 2–3) (emphasis added):

> The FCRA has never prohibited an employer from asking about criminal convictions in an employment application.  Moreover, because of the recent amendment to Section 605(a) [Section 1681c(a)] contained in the FCRA, consumer reporting agencies may now report information *about* criminal convictions without any limitation as to length of time that they antedate the report.  As a result, [consumer reporting agencies] may now be used by an employer to conduct comprehensive checks on the criminal histories of job applicants or employees.

Based on the word "about," American DataBank leaps to the conclusion that dismissed charges arising from the same transaction as a criminal conviction may appear on a consumer report.  No binding authority is cited by American DataBank for this conclusion.

Plaintiff responds with *Serrano* and *Moran*, both decided before Ms. Dunford's 2013 report, and *Haley*, a 2014 decision.  In *Serrano v. Sterling Testing Systems, Inc.*, 557 F. Supp. 2d 688, 693–94 (E.D. Pa. 2008) (Judge Gene E. K. Pratter), the district court found that the existence of outdated arrest records fell "squarely within subsection (a)(5) [Section 1681c(a)(5)]" because an arrest record may reasonably be expected to have an unfavorable bearing on a consumer's eligibility or qualifications for employment."  In *Moran v. Screening Pros, LLC*, No. 2:12-CV-05808-SVW, 2012 WL 10655745, at *4–5 (C.D. Cal. Nov. 20, 2012) (Judge Stephen Wilson), defendant's motion to dismiss the Section 1681c(a)(2) and 1681c(a)(5) claim was granted.  The Section 1681c(a)(2) claim was dismissed because "the filing of a criminal charge, the court county from where the information were obtained, the count charged, the dismissal of the count, and the date of the dismissal" were not "records of arrest."  There was no Section 1681c(a)(5) violation because the "date of disposition" (the date the misdemeanor was dismissed) did not antedate the report by more than seven years.  (This decision is on appeal.  The FTC has filed an *amicus* brief supporting reversal because the relevant date, in its view, is the date of the charge, not the date of dismissal.)

United States District Court

For the Northern District of California

A few months ago, in April 2014, Judge Marsha Pechman stated that "'[r]ecords of arrest' and 'adverse' information include dismissed charges." *Haley v. TalentWise, Inc.*, No. C13-1915 MJP, 2014 WL 1304007, at *2–3 (W.D. Wash. Apr. 2, 2014), *reconsideration denied*, 2014 WL 1648480, at *2 (W.D. Wash. Apr. 23, 2014).  Defendant's motion to dismiss the FCRA claims was denied because, *inter alia*, "a record of arrest which includes a dismissed charge from over seven years ago is adverse information that consumer reporting agencies cannot disclose."  The district court stated:  "determining whether [defendant's] interpretation is objectively reasonable would require factual determinations (*i.e.*, testimony from [defendant's] employees regarding Defendant's interpretation), which are inappropriate on a [Rule] 12(b)(6) motion." *Haley*, 2014 WL 1648480, at *2.  (The defendant there has now filed a motion for partial summary judgment.)

This order recognizes that an arrest record is not the same as a dismissal.  An arrest record resides in the police department.  A dismissal resides in a courthouse.  Also, an arrest may or may not lead to a charged offense in court, leaving the reader unsure how it ended whereas a dismissal assures the reader that the charge was terminated.  Nevertheless, this order disagrees that a dismissal falls short of being an "adverse item of information."  It is common knowledge that a plea bargain often involves a guilty plea to one or two counts in exchange for dismissing other counts, leaving the world to speculate whether the offender may well have been guilty of more than what he pled to, presenting the same vice as arrest records.

It is quite clear that stand-alone dismissed charges (more than seven years old) must be omitted under the Act but what about the circumstance where the dismissed charge is part of a "record of conviction" on a related charge, as here?  Arguably, such dismissed counts are part of the "record of conviction" and may be disclosed under the 1998 amendment.  On the other hand, the conviction is just the specific count of conviction, not the conviction plus all the dismissed charges.  It can be argued both ways.

In light of the remedial purpose of the Act, this order now holds that only the actual convictions may be reported and stale dismissed counts must be combed out and go unreported.  On this specific issue, this order accepts the view of plaintiff's counsel and Judge Pechman.

Nonetheless, our current record is incomplete as to whether American DataBank willfully violated Sections 1681c(a)(5) or 1681c(a)(2).  It is simply not enough for the Vice President of American DataBank to state that (Bradley Decl. ¶¶ 4–5, 7):

> American DataBank has never considered dismissed charges obtained from state or county court records to be 'records of arrest' . . . . Prior to February 2014, American DataBank's understanding of 15 U.S.C. 1681c(a)(5) was that the FCRA authorized reporting of dismissed charges older then 7 years because dismissed charges were not considered to be an 'adverse item of information' . . . . the dismissed charges shown on the Dunford report were consistent with both FCRA Section 1681c(a) as understood at that time and internal American DataBank review practices at that time.

*First*, it remains to be seen whether American DataBank's view that dismissed charges were not considered to be an 'adverse item of information' was objectively reasonable at the relevant time.  (Ms. Dunford's report was completed before the *Haley* decision.)

*Second*, American DataBank's own review procedures for California clients would have required removing the stale dismissed charges.  The stale dismissed charges on Ms. Dunford's report were a "mistake."  The Vice President of American DataBank admitted that "the Dunford report did not conform to California law" (Bradley Decl. ¶ 11).  He testified:  "[w]e have processes in place to prevent these things from happening, and it slipped through" (Bradley Dep. 95).  He acknowledged the error (Bradley Dep. 103–104):

> Q.  And so the result of Ms. Dunford's report where there's dismissed charges older than seven years that are reported, that was just somebody just missed it?
>
> A.  It's an erroneous error, yes.

*Third*, there remain gaps in the record, as fact discovery has not closed, so without the benefit of a more complete record, this order cannot find that American DataBank did not willfully violate Sections 1681c(a)(2) and/or (5).

Accordingly, American DataBank's motion for summary judgment is **DENIED**.

\*          \*          \*

It is undisputed that American DataBank has not invoked the advice of counsel defense. Nonetheless, in support of its summary judgment papers, defendant voluntarily referred to the advice of Attorney Roger Adams (American DataBank's local counsel) in February 2014, and

United States District Court

For the Northern District of California

1    referred to having "FCRA expert counsel," Seyfarth Shaw LLP (Bradley Decl. ¶¶ 1, 10; Adams

2    Decl. ¶¶ 2–4).

3       An often-used gimmick in litigation is to refer to having used outside counsel to foster the

4    impression that an accused wrongdoer was acting in good faith based on the advice of counsel —

5    without waiving the privilege to allow the other side to learn the actual advice given and whether

6    the party actually relied on it.  American DataBank, however, has not invoked the advice of

7    counsel defense.  Accordingly, American DataBank will not be allowed to reference any legal

8    advice (or consultation with counsel) in the presence of the jury (without receiving prior

9    permission to do so), unless it allows full discovery into the subject matter, which it has not done

10    so far and would need to do before the end of the fact discovery period.  This order gives

11    defendant **SEVEN CALENDAR DAYS** to file a statement on whether it will rely on the advice of

12    counsel.  This is without prejudice to a timely formal motion to compel brought by plaintiff

13    seeking full discovery according to the present record (based on the theory that defendant has

14    already waived the privilege).

15      **2.**     **MOTION FOR CLASS CERTIFICATION.**

16       The party seeking class certification bears the burden of showing that the four

17    prerequisites of Rule 23(a) are met:  (1) numerosity; (2) commonality; (3) typicality; and (4)

18    adequate representation.  The proposed class must also be ascertainable.  As Ms. Dunford seeks to

19    certify a statutory damages class under Rule 23(b)(3), there must also be predominance and

20    superiority.

21      **A.**     **Proposed "Disclosure Form" Class.**

22       Sole named plaintiff Ms. Dunford moves to appoint herself as the class representative for

23    the following proposed nationwide "Disclosure Form" class:

24          All individuals who ordered a consumer report on said individuals
            from American DataBank wherein the request was made by

25          executing a Disclosure and Release Form containing the statement
            "I release and discharge American DataBank, and all of its agents

26          and associates, any expenses, losses, damages, liabilities, and any
            other charges or complaints for the investigative process" during

27          the [FCRA] statute of limitations period preceding the filing of this
            Lawsuit and continuing through the date the Class list is prepared.

28

1    She seeks to represent this proposed class for the Section 1681b(b)(2)(A) (*e.g.*, release in the

2    disclosure form) and Section 1681b(b)(1)(A) (*e.g.*, person who obtains the report from the agency

3    must provide certifications) claims.

4         A triable issue herein is whether American DataBank's reports for the San Diego City

5    College were for "employment purposes."  This is a common question that is amenable to

6    classwide discovery and proof at least as to San Diego City College.  *See Wal-Mart Stores, Inc. v.*

7    *Dukes*, 131 S. Ct. 2541, 2551 (2011).  This question, however, does not extend to the entire

8    consortium or a nationwide class.  A determination of employment status may well vary from

9    school to school, nursing program to nursing program, and clinical facility to clinical facility,

10   depending on application of the *Darden* factors.  None of the clinical facilities has been deposed

11   and our current record is focused on the San Diego City College nursing students.  It does not

12   necessarily extend to all nursing schools in the consortium and certainly not to "[a]ll individuals

13   who ordered a consumer report on said individuals from American DataBank."

14        There is also the oddity here concerning the roundabout way in which the reports were

15   routed, an issue that would be unlikely to apply outside of the consortium.  Students elsewhere in

16   America should not be saddled with a class plaintiff who suffers from this extra baggage,

17   especially in a case which turns wholly on willfulness.  More than that, however, is the personal

18   baggage of Ms. Dunford in the form of her lengthy and recent criminal history.  To saddle a class

19   with a representative who has seven criminal convictions appearing on her American DataBank

20   report, is a convicted felon, has been convicted of (or pled no contest to) ten misdemeanors, and

21   has been charged with felony first-degree burglary, aggravated trespass, and vandalism while this

22   action was underway, is a tall order posing at least two challenges.

23        The first challenge is Rule 609 and the risk that Ms. Dunford could be clobbered on the

24   stand with some of her convictions to the detriment of the class.  Her felony conviction would be

25   admissible.  Possibly some of her other convictions would be — possibly not — it is too long a list

26   to wade through one by one.

27        The second challenge is that Rule 23 class representatives owe fiduciary duties to absent

28   class members and are responsible for critical litigation decisions on behalf of the class.  The class

26

representative selects counsel, responds to discovery, and participates in settlement negotiations, among other duties.  Indeed, Ms. Dunford plans on attending the settlement conference in September 2014 (Dunford Decl. ¶ 14).  The Court is unwilling to entrust these important fiduciary duties to someone like Ms. Dunford with such a severe and ongoing criminal record.  This order finds that Ms. Dunford is not an adequate Rule 23 class representative because she is unable to vigorously represent the best interests of the class and unfit to properly exercise her fiduciary duties to absent class members.  She has suffered from alcoholism-related problems and while this class certification motion was pending, Ms. Dunford was charged with felony first-degree burglary and vandalism.  She was convicted of the vandalism charge.  The day before the class certification hearing, she was arrested and pled guilty to aggravated trespass.  The undersigned judge will not leave the rights of absent class members and the negotiating powers of the class in the hands of someone who was arrested the day before the class certification hearing, convicted of vandalism while class certification was pending, and recently "entered the wrong apartment . . . while intoxicated" leading to a guilty plea of aggravated trespass, not to mention all the other convictions.  Ms. Dunford has shown herself to be too distracted by her own criminal defense and alcohol-related issues to be able to vigorously represent the best interests of absent class members.  Accordingly, Rule 23(a)(4) is not satisfied.  Ms. Dunford cannot fairly and adequately protect the interest of the proposed class.

*          *          *

This order must also call out counsel for plaintiff's failure to disclose Ms. Dunford's lengthy and ongoing criminal history up-front.  When counsel filed the motion for class certification, they did not candidly disclose Ms. Dunford's extensive criminal history.  Instead, *sua sponte*, the undersigned judge had to — on two occasions — pry this adverse information out of plaintiff and her counsel.  The first response was vague and led to a second request for details, and those details were most troubling.  Plaintiff's counsel either tried to slip this bad record by the Court or did a poor job in vetting Ms. Dunford in the first place.

### B.     Proposed "Obscure Information" Class.

For the other proposed class, the reader, no doubt, presumes that plaintiff's counsel must be proposing a class of those for whom dismissed charges older than seven years were reported (and who earned less than $75,000 annually).  This expectation would fall short of the actual, massive proposal by counsel.  In brazen overreach, plaintiff's counsel seek a nationwide class that includes all manner of prohibited information having nothing to do with the particulars of Ms. Dunford's case.  They propose a class that would include victims of reports including prohibited bankruptcy data, civil suits and judgments, tax liens, accounts placed for collection and so on, as follows:

> All natural persons residing in the United States (including all territories and other political subdivisions of the United States)
>
> (a) who were the subject of the American DataBank consumer report;
>
> (b) that contained at least one record of
>
> (i) cases under Title 11 of the Bankruptcy Act that, from the date of entry of the order for relief or the date of adjudication, whichever is applicable, predates the report by more than ten years,
>
> (ii) civil suits, civil judgments, and *records of arrest* that, from the date of entry, predate the report by more than seven years or until the governing statute of limitations has expired, whichever period is longer,
>
> (iii) paid tax liens which, from the date of payment, predate the report by more than seven years,
>
> (iv) accounts placed for collection or charged for profit and loss which predate the report by more than seven years, or
>
> (v) *any type of criminal history information (other than criminal conviction) that predates the report by more than seven years*;
>
> (c) that was furnished for an employment purpose for a position for which the annual salary is less than $75,000; and
>
> (d) within the FCRA statute of limitations period preceding the filing of this action through the date the Class list is prepared.

The short answer to this vast proposal is that Ms. Dunford is not typical of the broad scope of this proposed class.  Her only grievance relates to inclusion of the full record of conviction (for records older than seven years) rather than the redacted record of conviction.  Her grievance has nothing to do with tax liens, civil cases, bankruptcy and so on.  Even if she was an angel with no

28

United States District Court
For the Northern District of California

recent criminal record, she would not be a typical representative for the expansive class proposed. This voracious overreach alone is a dispositive basis for denial of the proposed class.

Moreover, should a criminal with such a long penal record, including recent convictions, be trusted with a fiduciary duty to protect the best interests of the class?  If the class were limited to the issues of stale dismissed criminal charges it possibly would be tolerable since crime is inherent in that problem.  But counsel have reached far beyond this.

Possibly, plaintiff's counsel may ask that the Court cut back the class to those who have suffered stale criminal dismissals on their reports.  This will not be done.  As a matter of principle, counsel should have started with a reasonable proposal.  Rule 23 motions are not a negotiation in which counsel ask for the moon while being willing to accept whatever is reasonable.  Counsel should be reasonable from the start.

Furthermore, Ms. Dunford would be inadequate even as to a stale dismissed-charges class. She is subject to the two-year statute of limitations — since she specifically saw her report — whereas many class members would be entitled to seek the benefit of the five-year outside limit, the additional three years being available for those who were unaware of the violation.  Ms. Dunford is not typical of those entitled to the five-year limit.

A final point concerns manageability, proof of liability, and ascertainability.  In order to ascertain who would even be in the class and who would have a claim, the following would need to occur:

- All reports nationwide within the statute of limitations would have to be manually reviewed and those with dismissed charges more than seven years old listed.  This would be the starting point for ascertaining the universe of class members as well as the existence of a violation.

- The annual incomes of each such person at the time of the report would have to be discovered and only those less than $75,000 could be included in the class.

- The particulars of each non-conforming report would need to be determined to see how many prohibited items there were, for the willfulness statutory damages would be "not less than $100 and not more than $1,000."  The extent and number of the prohibited items would be material to that determination for each class member.  That is, the award may vary from class member to class member depending on the number of violations per member.  *See* 15 U.S.C. 1681n.

29

United States District Court

For the Northern District of California

1   None of this extensive homework has yet been done in this case and, based on the

2   information provided at the hearing by both counsel, it cannot possibly be done in the time

3   remaining (fact discovery closes herein on September 5).  Why plaintiff's counsel have let this

4   slide is not clear, but what is clear is that this homework has not begun.  Who would have to bear

5   the expense of this homework (or how it might be split) is a separate issue; the immediate point is

6   that counsel have not supplied a record to show that the claim could be proven at trial on a

7   classwide basis, much less that it could be proven to be willful.

8       **3.    OBJECTIONS.**

9       On July 30, defendant filed evidentiary objections to exhibits provided in support of

10   plaintiff's supplemental brief.  At the hearing, plaintiff's counsel corrected the citation errors in

11   their brief.  On August 8, plaintiff filed a response.  Defendant's objections are relevance and lack

12   of authentication.  While it is true that plaintiff's counsel did not have personal knowledge of the

13   "Disclosure & Release Form" signed by plaintiff, neither side has previously disputed the form

14   Ms. Dunford signed containing the release.  Furthermore, this order does not rely on Exhibit 7 to

15   the Declaration of Craig Marchiando, which appears to be a National Employment Law Project

16   report, dated March 2011.  Defendant's evidentiary objections are **OVERRULED AS MOOT**.

17       On August 1, plaintiff filed a "notice of errata," proposing a revision to the proposed

18   "Obscure Information" class.  Plaintiff sought to change "(c) that was furnished for an

19   employment purpose for a position for which the annual salary is less than $75,000" to "(c) that

20   was *not* furnished for an employment purpose for a position for which the annual salary is

21   $75,000 *or more*" (Dkt. Nos. 46 at 10, n.3, 89).

22       On August 4, defendant filed an objection, arguing that this was a tardy attempt to amend

23   the definition of the proposed "Obsolete Information" class without bringing a proper motion to

24   amend the second amended complaint.

25       Since plaintiff's motion to certify a "Obsolete Information" class is denied, defendant's

26   objection is **OVERRULED AS MOOT**.

27

28

**CONCLUSION**

Defendant's motion for summary judgment is **DENIED**.  Plaintiff's motion for class certification is **DENIED**.  Counsel's motion to appoint class (or interim) counsel is **DENIED**. All deadlines remain in place.  This action will proceed on Ms. Dunford's individual claims only.

**IT IS SO ORDERED.**

Dated:   August 12, 2014.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE